14-3059, 14-3456, 14-3457, United States of America v. Mickey Fugate, Oral Argument Not to Exceed 15 Minutes per Side, Zenaida Renee Lockard for the Appellant. Good morning, Your Honors. Good morning. May it please the Court, my name is Zenaida Lockard and I represent the Appellant Mickey Fugate. I'd like to reserve three minutes for rebuttal. Your Honors, my briefs address two issues, but I'd like to focus my time today on the denial of the motion to suppress. This is a case about deliberate, intentional police misconduct that if left undisturbed will send a message to officers everywhere that any time a serious crime is committed, you can commit constitutional violation after constitutional violation in order to get your guy. I'd like a statement, though, for the facts of this case. I mean, there'd been a robbery, the police were investigating it, somebody gets a call, they go in an area, they see a car matching the description. Admittedly, the officer goes on to the grounds, but he has to see something. He didn't just go behind every house in the neighborhood, did he? Well, Your Honor, I think there is an example, and I'm glad Your Honor mentioned that. I think there's an example that these officers were going to other houses. Officer Zimmerman testified that while he was at 140 Drummer, another officer went into a different yard, or a group of officers, I'm not clear on that, and they shot a dog. So these officers were responding to... Did he shoot somebody at the store? That's correct, Your Honor. He did. He was out there with a gun shooting people in the middle of the night? That's correct. And the officers were called to try to find out what was going on, and to preserve the safety of the neighborhood as much as they could. What is wrong with, in this kind of urgent situation, for a police officer to try to What the officer thinks is the getaway car, and comes into the yard to see if that's the car, and finds that it is. I mean, there's no great expectation of privacy in the curtilage. It's certainly much reduced from that evading someone's house. Your Honor, I think you raised two issues. One being the timing of when Officer Saylor's entered the curtilage, and then the second, the question about whether there's a reduced expectation of privacy in the curtilage. With regards to the timing, I think Officer Saylor's testimony is clear, that the robbery was committed 30 minutes prior to him entering the curtilage, and 17 minutes after the... The guy's abroad, in the neighborhood, apparently, and who knows who else he's going to shoot, or who else he's going to try to rob. I mean, this is a pretty exigent, urgent circumstance here. And doesn't the public safety exception apply, given the facts of this case? You mentioned an egregious violation, but here, 30 minutes, given the facts of this case, is not a terribly long period of time. These officers are in an investigative state, and he goes under the curtilage and looks, but then they get a warrant. Your Honor, I think it's important that the district court found... Well, first, Your Honor, it is our position, and I'm not going to argue that for purposes of today, because of timing issues, but we do argue that the government waived their right to raise this public safety exception, as well as the hot pursuit exception. But the court did not find that there was actual public safety in this case. They found, under United States v. McLean, that it was close enough to the line of validity, and they relied on United States v. Dawes. I think that particular case is very distinguishable from the facts that we have in this case. In United States v. Dawes, officers responded to a victim who'd called about a home invasion. When they got the call about the home invasion, the person said that he knew who the defendant was. He knew Dawes. The officers then got a second call from a victim who said that Dawes had, after committing that home invasion, entered his property and said, you know, I want to hide the money here. If you don't let me hide the money here, I'm going to kill you. And then the officers actually knew this defendant. They had experience with him. They knew of his prior record. They knew his convictions. One officer was a corrections officer. This case has different facts, but you're not saying that these officers should not have been out there trying to investigate and find this person who just shot somebody. I'm not saying that the officers should not have been investigating. They should have. But there were other measures that the officers could have taken that would not have violated the Constitution. They could have. There was a number of officers that had responded to the area. So they could have had officers sit on that particular house until the car left. They could have had a helicopter fly over. Repeat that again. Repeat that again. They could have had officers sit on that particular property, like outside of the alley, to see when the car left, to see if they could confirm that it was the car. Wait for the guy who'd done the shooting to leave? Well, Your Honor, they had multiple officers responding to the scene. They had multiple officers responding to the scene. They could have gone next door to another property and said, hey, can we come onto your property lawfully, look over your fence, and see if we can see if this is the car that we're looking for. They had other options. This officer, after entering into the curtilage, in fact took some of those other options. He went to the front door. He tried to do a knock and talk. He walked down the street. He talked to the 15 construction workers that were working on another property. He did some of these other measures that he could have done in this case. And I think it's important to look at the actual facts of this case. This officer did not run into the property to see if this was the car. He stopped his car in the alley, and he made a tactical decision, an intentional decision, a deliberate decision to cross into private property. He said in his testimony that he knew it was private property that he entered onto. And he went around the pool and tried to verify if this was the car that was in fact used in this robbery. And I think the setup of this particular house, getting back to what you had mentioned, Judge Mara, in terms of the curtilage and whether there's a reduced expectation of privacy, the setup of this house is important. The district court in its decision and order found, and there's no dispute about the facts of this case, found that the back of this house was surrounded by two fences on either side, the alley was open, and there was a large above-ground pool. And there was no back door on this property. So the car is parked between the above-ground pool and the house. And when the officer enters onto the curtilage, he has to go around that pool in order to see whether or not this is in fact the car. The district court found that he could only see from his vantage point the top 12 to 18 inches of the car. He couldn't tell the make. He couldn't tell the model. He couldn't tell if it didn't have a license plate. Those were descriptive factors that were given to this officer when he started to look for this individual. But he couldn't tell any of that from the alley. I have a question from Exhibit 3 that's in our record. From what vantage point is this photo taken? Where's the photographer standing? Your Honor, it's my understanding that he was standing in the alley where the officer was. And I think it's important, if you look through the record, three different officers testify about the vantage point that Officer Saylor's had before he entered into the curtilage. Okay, well, if he's standing, if the photo is taken from a position in the alley where the officer is standing, I don't know how he would have to go around the pool to see the car. Your Honor, and again, I didn't have the benefit of actually getting to see that exhibit. So I'm not 100% sure where it was actually taken from. But from my reading of the record, it's my understanding that from the alley when he first saw it, he could not actually see the make or model of the car. I don't think there's a question about that fact. That was a factual finding by the court. You don't agree that... Is this the view from the alley? Your Honor, I believe that would be the view from the alley, because it's the back of the house. And my understanding of how the house is set up is that there was a parking pad that was, you know, right next to the alley or buttressed up to the alley, and then there was the pool. And wedged in between the pool and the house was the car. And I think the brown car was a detective's car or an officer's car. I really don't think that the officer was faced with an emergency situation where 30 minutes before someone had robbed a store and shot the clerk in the store and was now going in a particular direction and was at large. That's not an emergency. I don't believe that when the officer crossed into the cartilage that it was still an emergency situation. No, Your Honor, I don't. I believe that all of these officers that had responded to that area were doing just as he was doing. They were trying to find the suspect. But when he crossed and... Doesn't that indicate an emergency when you have a number of officers who are trying to preserve the safety of the neighborhood or trying to find this guy who had just shot somebody in a robbery? But, Your Honor, I think if you look at Officer Saylor's testimony itself, when he crossed into the cartilage, he wasn't trying to find the suspect. He was investigating a completed crime. He was trying to see if that car was in fact the car that was used in the robbery. And he says that in his testimony. He says that when... Not a shooting. That's correct, Your Honor. That's correct. Somebody got shot. That's correct. The guy may be... What does the officer know about who this person is? He's trying to find out how... What the situation is and where other people are going to get harmed as well. Well, the officer at the time that he entered the cartilage, the facts that he knew by his testimony, he did not know that the firearm was used in the robbery. He did know that the firearm was used... It was used to shoot at good citizens that had given chase. But he also knows that that chase was completed. It was over 17 minutes before he found this particular address. And when he crossed into the property, he did not see an individual. He did not see a suspect. He did not say that he was trying to find the suspect. He walked onto the property and he said that he went immediately around the pool to look at that car and see if that car was the car that was used. And so what he's doing at that point is actually investigating a crime. He's not looking for the suspect. He's not in hot pursuit. How does this court's decision in McLean affect your assessment and argument of this situation? I'm glad you brought that up, Your Honor. United States v. McLean is factually distinguishable for important reasons, and I think that will change the analysis in this particular case. In United States v. McLean, the officer who was responding went to a location that was known. There is no known location in this house. They're just looking at every house for the suspect. So he went to an address that was known. He was reporting to what was a suspicious incident. When he entered the property, it was known that the individuals had vacated that property for several weeks and there was a light on. And based on this court's case law that burglary can be an exigent circumstance, the officer entered the property unknowingly. Then, weeks later, after they've done surveillance, he gets a warrant, well not him, but the police force got a warrant to search that property because when he entered in suspicion of the burglary, there was a marijuana grow operation that he found. In our particular case... And what did they hold was improper? The initial entry? That's correct. The initial entry was improper, as this court has already affirmed, that the initial entry was improper. But importantly, in our case, in the actual warrant, it was not disclosed to the magistrate the actual legal entry. What was disclosed to the magistrate was that the officer knew the make and model of the car when he entered the property. That's not factually correct. The officer did not know the make and model of the car when he entered the property. All he could see was the top 12 to 18 inches of a dark car. So when he entered that property, he did not know that he was entering the property of the suspect. He got lucky. And unfortunately, he got lucky by violating Mr. Fugate's constitutional rights and who violated if this court affirms the district court's decision below. So I think for those reasons, this case is very different than United States v. McLean. Who got the warrant in this case? Your Honor, I don't have the exact name, but I know that it was not Officer Saylors who was the affiant. It was a different officer. Yeah. Why doesn't the good faith exception, though, save this? Well, Your Honor, I think the good faith exception doesn't save this particular case because in United States v. McLean, where it did save it, this is not... If the court permits Officer Saylors to do what he did, basically anytime there's a quote unquote serious crime, officers will be able to cross into the curtilage and look through anyone's yard in order to get their suspect. He didn't know that this is where the suspect was. He didn't know that this was the car. Had he known it was the car, we'd have a different scenario. He was investigating. Okay. And you've explained McLean to me, but hasn't the Supreme Court sort of enlarged the lens through which courts look at and apply the good faith exception? Your Honor, I think that that kind of leads into our argument about hearing and when you do the cost-benefit analysis of whether or not exclusionary serves its purpose of deterrence at the societal cost of letting an individual like Mr. Fugate go. And I think when you look at this case and you look at United States v. Herring, the important fact there is that the courts that apply the exclusionary rule and refuse to apply good faith look at whether the officer's conduct was intentional. And I think the court says in United States v. Herring, they say that because the officers in those cases, and I won't belabor the facts of those cases, but because that was a police record mistake and it was a negligent error, that they don't apply the exclusionary rule because it won't serve its purpose of deterrence. In this case, we have a tactical decision by an officer to investigate a crime that would be deterred. He entered an area that he should have known. He was a seasoned veteran officer of 11 years. He should have known he was entering an area protected by the Fourth Amendment. And so when he entered that area to investigate this crime, that's why the exclusionary rule should be applied. And good faith should not save it because that would be at the cost of all of our constitutional rights, not just Mr. Fugate's in this case. Thank you. Thank you, Your Honors. May it please the Court, Ben Glassman on behalf of the United States. This is not a quote unquote serious crime. It actually was in fact a serious crime, not just serious. It was an emergency as Judge Merritt... Okay, but the law of the case that stands right now is that it was an illegal entry into the backyard. Yes. Okay. All right. And so actually then, let me come back to Judge Merritt's point and go to Judge Donald's point first. What we're not talking about for exactly what you said, Judge White, the law of the case is that the initial entry into the curtilage was a Fourth Amendment violation. That's the law of the case from the first appeal. But what's at issue in this appeal is whether or not the evidence that was seized in the execution of the search warrant has to be suppressed. That's what this court sent back to the district court to consider. That's what Judge Rice considered. And that's what the district court correctly in the government's view determined that the officers could have relied in good faith on this warrant. Now why is that? Under United States v. McLean, when officers get a warrant and part of the facts that go into the affidavit to get the warrant were obtained unconstitutionally, if that's later determined, but it's close enough to the line of validity that a reasonable officer wouldn't know that that was a Fourth Amendment violation, then the officer who executes the warrant can rely on the warrant in good faith. And that's what happened here. In terms of comparing this case to McLean, I want to... What's left then? I mean, what's left of the fruit of the poisonous tree argument? I mean, officers don't read warrants anyway. They're given a warrant. If they look at the place and what they're supposed to find, they're not going to read the supporting affidavit to see if it establishes probable cause or if there's false things in there. Oh, well, then that's at their peril, because under Leon, if no reasonable officer could have thought that the warrant was supported by probable cause, that will be suppressed under Leon. And it's the exact same rule in McLean. Yeah. I guess that's true. You're right. But I don't think they read them. And they sort of assume that somebody else did all of that, don't they, as a practical matter? They assume that... They assume that the magistrate looked and found that it was okay. I mean, I understand what you're saying, that if it's apparent on its face that it's insufficient. The only question we have before us here, whether the entry into the curtilage was protected by Leon and the good faith exception, which is what apparently the district court found. Essentially, yes. Is that the only question we have? Yes. If I could phrase it very... But then how does that affect the warrant? I don't understand. Yes. Let me phrase it slightly differently. In this case, the police officers responded to an emergency and they neutralized the emergency. They made it safe. They did not then engage in any further search of the premises, the backyard, the house, anything. They secured the scene and got a warrant, which is what we want them to do. So the only question, because it was later determined that the initial entry into the Fourth Amendment, the only question is whether that violation, that entry was close enough to the line of validity that a reasonable officer could have thought that it was valid. Because if that is the case, then under McLean, the law of the circuit and the law of the case, then the officer could have and did rely in good faith on the warrant. What about the stuff that wasn't seized pursuant to the warrant? What about the stuff in the backyard? There was no evidence seized except pursuant to the warrant. In fact, if you look at, I mean, just in- It was left there. Right. Exactly. Right. That's right. In fact, if you look at the testimony of Officer Saylor's at the suppression hearing, look at page ID 90 to 92, he's questioned by the prosecutor, well, how much currency did you see strewn around the ground? He says, I didn't stop to count it. Well, they say, well, was there a key in the ignition? I didn't check. Well, was it worn to the touch? I don't know. But there's none. We don't have any question before us having to do with the entry into the home. No. Not me. The window. None of that is pertinent here. Correct. Correct. Well, why isn't that pertinent here if it's part of what is, if it's part of the support for the warrant? Because the, no one has argued that that was, no one has argued in the posture of this appeal that that was improper in any way. Entry into the house. Correct. In other words, if there were a problem, it's been weighed. That's right. That's right. With respect to comparing this case to McLean, in answer to Judge Donald's point, I think the district court got that totally right. If you look at pages 18 to 19 of the court's opinion, it says, the reasons for applying the good faith exception are more compelling in this case than in McLean. The warrantless entry into the backyard was much less intrusive than the entry into the house in McLean. Public safety was a much bigger concern in this case because the suspect was clearly armed and dangerous. In contrast, in McLean, the officers merely suspected a burglary in the process, in progress, and had no evidence that the burglar had any weapons. I think that's entirely right. In point of Judge Merritt's discussion with my colleague about the exigency, it wasn't actually just that 30 minutes ago there had been a robbery of a quick and cold convenience store where the assailant shot the clerk. In addition to that, when he then jumped in this Cadillac with no visible plates and drove away, citizens pursued him and were in contact by cell phone with Dayton Police Dispatch until the assailant turned out of his car and shot at his pursuers. And that was about 15, or as my colleague would say, 17 minutes, 15 or so minutes before the car was found. So in this case, the officer was new. You're saying surely there was exigent circumstances. Absolutely. Public safety, danger to the police and the community. You have an active shooter. That's not before us, right? Yes, it is. It's before you in the context. Look, the only reason it's not before you in terms of being able to say the entry into the cartilage was fine, the only reason it's not before you is because the United States messed up at the trial level the first time and this court held that we had waived that argument. But what is before you is whether or not the officers could have relied on the subsequently issued warrant in good faith. And it's before you as part of that question because they could have relied on the warrant in good faith so long as the violation was close enough to the line of validity that a reasonable officer could have thought what I did was constitutional. And the United States thinks that's certainly the case. In fact, as the United States argued in the first appeal, we think that the entry into the backyard was fine under the circumstances given the exigency and that they just walked up to the car. You don't think that the government didn't handle it correctly and therefore there was a holding, I guess, by this court that there were no exigent circumstances sufficient to allow the entry into the cartilage? How did the government get itself messed up there? It was a matter of the arguments that we raised at the trial level initially in response to the motion to suppress. So you didn't argue it was exigent circumstances? We argued that it was exigent circumstances to enter the house, neglecting to argue that it was exigent circumstances to enter the yard. Oh. They said it wasn't part of the cartilage or something like that? No, we conceded that it was part of the cartilage. I think the assistant United States attorney at the trial level... Didn't understand the law. Is that what you mean? Candidly, Your Honor, that assistant United States attorney was ill and has since passed away. So I think that we had some unusual circumstances. Kind of ineffective assistance of counsel by the government, so to speak. Your Honor, it's the law of the case at this point and we certainly accept it. But we believe that what was before, what this court sent back to the district court on the good faith exception as applied in McLean, the district court got totally right. Because even if you think, even if we're stuck with, and we are, that there was this initial entry was a violation of the Fourth Amendment, nevertheless, it's not so obviously a violation of the Fourth Amendment that an officer would have thought, oh, I know I'm violating the Fourth Amendment when I do that. I mean, my colleague makes a big deal about, oh, the officer knowingly walked into the yard to check and see whether or not this car, and that is the right exhibit that Judge Donald referred to, that this car was in fact the getaway car, as he strongly suspected based on the time, the location. A little unclear, and maybe it has nothing really, it's not significant, but I didn't understand the law of the case doctrine to preclude the court from later finding that the original decision was based on a mistake. The law of the case doctrine is a discretionary doctrine, and so the court could revisit it. I don't think that's necessary for the court to revisit it in this case, because I think the district... You don't concede that the law of the case doctrine would prevent the court, if a judge of the court thinks that it was just a mistake that was made because of the way the government handled it, and now after the fact, when you look at the entire situation again, it's clear that there was a mistake. You don't concede that we're bound by the mistake, do you? I would urge this court to rule on the same basis as the district court did, the more narrow basis. I don't think there's... But the district court was bound by our decision that it was waived. Yes. To be candid, and this is part of the reason I'm hesitating on that answer, Judge Merritt, is that we have not argued, and neither for that matter has the appellant, that the law of the case doctrine, there's an exception that should apply in this appeal. I don't think it's necessary to prevent any injustice, because the district court's decision reaches the same result, and in the government's view, correctly so. What the district court thought, to be clear, if you look at the district court's opinion here is that it didn't think that there was no exigency. It thought that the officer didn't have probable cause. It just had a strong suspicion, maybe reasonable suspicion, but not probable cause to think that that was the cause. Okay, but exigency is an exception to the warrant requirement. Yes. Correct? Yes. Are you saying you don't need probable cause? Actually, I don't need to be that aggressive to win this position. I think that you need to have, if you then, if whatever you do is directed to the exigency, and then you get a search warrant, you are under McLean, and as long as it's close enough to the line of validity. In fact, in McLean itself, the problem in McLean itself was the court held that there was not probable cause. The court agreed there was an exigency, but not probable cause, but it was close enough. That's right. It doesn't get you, if the court is correct that there's no probable cause, and there really wasn't, there was suspicion, but then you can't go in, because exigent circumstances don't help you without probable cause. That's what I'm asking you. Okay. Well, I was resisting a little bit your hypothetical, but now I'll meet it head on. No, I actually think that if there is a sufficient exigency, if you've got an active shooter, and you've got a real strong reason for thinking that he's right there about to shoot, or could be shooting, you don't have the person under control. He didn't know that until, there's a top of a black car, very different from a black Cadillac without a plate. Well, it's a black car that very well could be a black Cadillac without a plate. Any black car could be that, and I don't think the law says that they can run from backyard to backyard. Well, there is no black car in any other backyard so far as this record reveals. What drew the officer's attention to this backyard was that you had a black car parked suspiciously between the house and the above ground pool, which in this officer's experience was not how people park cars in this neighborhood given that there was a parking slab right at the alley. So I don't think it's quite right to say that given a great emergency about having an active shooter on the loose. Well, I thought that the, maybe I'm just wrong, but that the exit circumstances doctrine of probable cause, that the, because of the emergency, the officers can go in and try to find, save the life of the person who may be dying or whatever the exigency is, it is a, it displaces the requirements that the Fourth Amendment normally requires and which we want to uphold. That is correct. That is correct. One way to discuss that though is to say that probable cause, and this is how the Supreme Court's routinely done it, is a flexible concept so that if, depending on the emergency and depending on the kind of intrusion, we're talking about different things. I mean, obviously in Ryburn v. Huff, there was no probable cause. The best way to say it is the question when you have an exit circumstances or an emergency is whether the officers acted reasonably in light of the emergency that they faced. Exactly. Exactly. In this case, you had the exit circumstances of a fairly recent shooting and a fleeing felon. You had an officer entering up on the curtains where there was a reduced expectation of privacy. You say that the officer, based on the investigation with the top of the black car being shown and being parked in a manner that people in that area didn't reasonably park a car, provided a reasonable suspicion for them to go on and get that preliminary investigation. At that point, they got a warrant, and so this is saved by that. Essentially, yes. The only additional point is that they also got the assailant and then got the warrant, but otherwise, yes. Well, except there's a wrinkle, which is that that's not the way you're really arguing. You're arguing because you've already forfeited the claim of that it was proper to go on. You're arguing that it was close enough to apply the good faith exception. Absolutely. Because they did then go and get a warrant, and that puts us under McLean. How do you respond to counsel's argument that, look, if you start saying that as long as there's some sort of emergency or whatever, we're going to say, okay, it's good faith and really just about any warrant's going to be okay as long as you have valid information? I respond in two ways. The first is that right or wrong on McLean, which is what the court is taking issue with in that question, right or wrong, we're stuck with it. It is the law of the case. But I think it's right, and I'm comfortable, the United States is comfortable with what we have here. If you're talking about not just any old emergency, but an active shooter who was shot at a clerk, shot at pursuers, we know the area. It was very recent. And we have a good reason, even if not necessarily probable cause, for thinking that he's right in that, either in that car or that is the car. We don't know where he is, and there's a great danger to the public and to the officers. Neutralizing that public safety problem and then getting a warrant, a warrant encouraging rule is a good thing under the Fourth Amendment. So the government's happy with the officer's conduct here. Therefore, we ask you to affirm. Thank you. Thank you. Thank you, Your Honors. I think there are several issues that I need to address that were raised by my colleague there. First, Your Honor, in this particular case, in order to excuse the need of a warrant, I think the case law is clear that you have to have probable cause plus exigent circumstances. That's stated clearly in McLean. The case site for that is 444 Federal 3rd, and it's on page 561. You're disagreeing that when you have an emergency, that the response of the officers to the emergency must be reasonable in light of the emergency. You disagree with that way of phrasing it, and you say that notwithstanding the emergency, you have to have probable cause under the probable cause standard. That's correct, Your Honor. I believe you have to have probable cause plus the exigency. What do you base that on? Well, Your Honor, that's stated very clearly in United States v. McLean. It says more precisely, the police may not enter a private residence without a warrant unless both probable cause plus exigent circumstances exist. And they're quoting United States Supreme Court case Kirk v. Louisiana, which is the 2000. This is an entering of a house? Your Honor, this is an entering of a curtilage, but I think that there's no dispute that that was a protected area, that that was protected by the Fourth Amendment. And to get back to your initial point about whether there are gradations of levels of protection for the curtilage, I don't believe... The case law is clear that the curtilage is protected. But even if you buy into this, there's a gradation of an expectation of privacy in your curtilage. Officers and sailors... Buy into that. So what's... I mean, isn't that true? It's not the same as entering somebody's home. It means out in the yard. Well, Your Honor, I think that the difference is, and if you look at the Florida v. Jardine's case, the difference is, was this an area with an implicit invited invitation? So when you look at a front door, there's the implicit invitation for individuals to come deliver mail, solicit, do things of that nature. If no one's home, they leave the property. There's no door where officer sailors entered into the curtilage. It's behind a pool. It's the most private part of a person's property that you can imagine, between your pool and your house. So there was no implicit invitation for him to walk back there into that particular area of the house. So I think for that reason, the Fourth Amendment should protect this particular area, because there was not an invited invitation for him to enter it. Your Honor, in addition, as far as the case posture, I think this has already been over... Gone over by my colleague, but they initially argued that the car was in plain view. And that's what they argued in the initial suppression motion, that the car was in plain view. It came out in the testimony that the car was not in plain view, that the officer could not, in fact, tell. And there was three different officers that testified to that fact. The officer could not tell what the car was. He could only see the top 12 to 18 inches of the car. Well, I mean, the top 18 inches or whatever it was, was in plain view. So there was a car in plain view, right? Right. But it was not known to the officer at the time when he saw the car that it was the car used in the burglary. He had to cross into the curtilage in order to determine that. That's correct, Your Honor. And when he did, he found that it was. That's correct, Your Honor. And if I may sum up, Your Honor, unless there's additional questions, Your Honor, crossing into the curtilage at 140 Drummer is the constitutional violation that brought us into court today. But I think Officer White struck the nail on the head when she said, if this court affirms the decision below, officers are going to be able to go through any backyard when they see any black car. Those are the facts that we have. It's very different than the facts that were in McLean. They did not enter a known location. He got lucky. He entered a property and happened upon the car. But he could have entered in front of any other property, and it could have not been the black car. So for all of those reasons, and to protect everyone's Fourth Amendment rights, Your Honor, we'd ask that you vacate the conviction. Thank you. Thank you. And the case will be submitted.